# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**HAROLD C. WILSON,**

*Plaintiff*,

**v.**

**CITY OF PHILADELPHIA, et al.,**

*Defendants*.

**CIVIL ACTION
NO. 04-05396**

**PAPPERT, J.**                                                    **April 8, 2016**

## MEMORANDUM

In April of 1986 the United States Supreme Court decided the case of *Batson v. Kentucky*, 476 U.S. 79 (1986), holding that the Fourteenth Amendment's Equal Protection Clause prohibits prosecutors from challenging potential jurors based on their race. *Id*. at 89. Prior to *Batson*, the Court's opinion in *Swain v. Alabama*, 380 U.S. 202 (1965) governed the analysis of alleged racial discrimination in jury selection. Under *Swain*, it was much more difficult for a criminal defendant to show that the prosecutor used preemptory strikes for racial reasons; rather than focus on a prosecutor's actions in the specific case at hand, the defendant had to show the "repeated striking of blacks over a number of cases." *Id*. at 92.

*Batson* lowered the burden of proof required to establish a *prima facie* case of purposeful discrimination in jury selection. *See Batson*, 476 U.S. at 96–98. The Court stated that a criminal defendant can establish a *prima facie* case of purposeful discrimination in jury selection solely on evidence concerning the exercise of peremptory challenges *in that particular case*. *Id*. at 96. If the defendant meets that burden, the prosecutor can then offer a race-neutral explanation for his challenges. *Id*. at 97. To do so, the prosecutor needs to do more than merely state that "he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that

they would be partial to the defendant because of their shared race." *Id*. The trial court, considering the prosecutor's explanation, then determines if the defendant has established "purposeful discrimination." *Id*. at 98.

At some point in 1986 or 1987, but certainly after the *Batson* decision, Jack McMahon ("McMahon"), an experienced prosecutor in the Homicide Unit of the Philadelphia District Attorney's Office ("DAO"), gave a presentation on jury selection to less experienced prosecutors in the office. McMahon's lecture was videotaped. The "McMahon Tape" became public in 1997 and quickly gained a measure of infamy as an example of what not to say and how not to say it. Ostensibly intended to be educational and, at least in part, to explain how the younger prosecutors could select juries in a manner that complied with *Batson*, parts of the lecture came to be interpreted as a lesson in how to circumvent *Batson*'s requirements.

Someone who took a particular interest in the McMahon Tape was the Plaintiff in this case, Harold C. Wilson ("Wilson"). Wilson, who is black, was on death row having been prosecuted by McMahon and convicted of three counts of first degree murder in 1989. In the months and years following his conviction, Wilson filed numerous post-trial motions and appealed the denial of those motions—one of which contended that McMahon violated *Batson*— to the Pennsylvania Supreme Court, which upheld the lower court's decisions.

Wilson then relied on the McMahon Tape in another round of post-conviction relief filings contending again, among other things, that McMahon unconstitutionally excluded blacks from his jury. After a hearing on Wilson's *Batson* claim, the Post-Conviction Relief Act ("PCRA") Court held that the prosecution violated *Batson* at Wilson's trial. Wilson's conviction was set aside and he was granted a new trial. Wilson was eventually acquitted of all charges

after his retrial and he thereafter filed this lawsuit against the DAO, the City of Philadelphia ("the City") and a number of former Philadelphia Police Department officers.

Wilson's claims against the DAO allege: (1) a violation of his equal protection rights under the Fourteenth Amendment; and (2) a 42 U.S.C. Section 1983 *Monell* claim contending that the DAO had a policy or custom of racial discrimination in jury selection which caused Wilson's constitutional injury.  (Second Am. Compl. ¶¶ 56–67, ECF No. 89.)[1]  Wilson also asserts a *Monell* claim against the City.  He alleges that the City's policies, customs or failure-to-train its officers on their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) violated Wilson's Fourteenth Amendment due process rights.  (*Id.*)  Wilson alleges the following against former officers of the Philadelphia Police Department: (1) *Brady* violations by former Homicide Detective Walter Hoffner ("Hoffner") and Laboratory Technician Lewis Brenner ("Brenner");[2] (2) malicious prosecution claims under Section 1983 and Pennsylvania state law against Hoffner; and (3) intentional infliction of emotional distress claims against Hoffner and Brenner.  (*Id.* ¶¶ 49, 51, 63–65.)

Before the Court are the Defendants' motions for summary judgment.  For the reasons that follow, the City, Hoffner and Brenner's motion is granted in its entirety and those Defendants are dismissed from the case.  The DAO's motion is denied as to Wilson's claim that the DAO had a custom of racial discrimination in jury selection because there are genuine issues of material fact which preclude the Court from determining as a matter of law that no such custom existed.

---

[1]     Wilson concedes that he erroneously labeled his second amended complaint as the "Third Amended Complaint."  (*See* ECF No. 104 at 1.)  The Court thus refers to the operative complaint as the Second Amended Complaint ("Second Am. Compl.").

[2]     Wilson's complaint also asserts *Brady* claims against a number of other officers.  (*See generally* Second Am. Compl.)  In his response brief, however, Wilson concedes that he has abandoned all claims against all officers except Hoffner and Brenner.  (Pl.'s Resp. to City's Mot. Summ. J. ("Pl.'s Resp. to City") at 2, ECF No. 218.)

## I.  A Triple Homicide, the Investigation and Criminal Charges Against Wilson

At 10:13 a.m. on April 10, 1988, officers from the Philadelphia Police Department responded to a disturbance call at 1516 South Stillman Street ("the Stillman House").  (Joint Appendix ("JA") 5930.)[3]  Upon arrival, the officers discovered the bodies of Dorothy Sewell ("Sewell"), Tyrone Mason and Cynthia Goines ("Goines").  (*Id*.)  Each had sustained multiple stab, chop and slash wounds to the head, neck, trunk and upper extremities.  (*Id*.)  At 10:30 a.m., Sergeant Thomas Burke assigned Hoffner as the lead investigator.  (JA 5931.)  Dr. Jonathan Briskin pronounced Sewell, Tyrone Mason and Goines dead on the scene at approximately 11:40 a.m.  (JA 5937.)

### A.  April 10, 1988 Interviews and Evidence

At 11:20 a.m. on April 10, Hoffner interviewed Rachel Mason ("Mason"),[4] the woman who first discovered the bodies.  (JA 5948–52.)  Mason told Hoffner that she was Sewell's niece and was inside the Stillman House until 4:00 a.m. on April 10.  (*Id*.)  Mason admitted that she was smoking cocaine during the time she was at the Stillman House, and that five or six people came by throughout the day to purchase cocaine from Sewell.[5]  (*Id*.)  She stated that Sewell kept "a lot of money in her pocketbook," sometimes amounting to thousands of dollars.  (*Id*.)

Mason told Hoffner that when she left the Stillman House at 4:00 a.m., the only people who remained were Goines, Sewell, Tyrone Mason, Harry Mandeville ("Mandeville") and

---

[3]  Given the extensive record in this case, the parties have submitted a Joint Appendix.  The pages in the Joint Appendix are labeled with a prefix of "JA."  The Court maintains this numbering scheme when citing to the record.

[4]  Mason and Tyrone Mason were cousins.  (JA 5948.)  Because Mason features more prominently throughout the opinion, the Court refers to her as "Mason," and to her cousin as "Tyrone Mason."

[5]  Marvin Purdie ("Purdie") was one of the people who bought cocaine from Sewell.  (JA 5948–52.)  Mason kicked Purdie out of the Stillman House twice that weekend because "he was a real pain in the ass."  (*Id*.)  Homicide detectives interviewed Purdie at 2:20 p.m. on April 10.  (JA 6003–04.)  Purdie told detectives that he was kicked out of the Stillman House around 7:00 p.m. on April 9 for "fussing," and that he later returned but was not granted entry.  (*Id*.)  Purdie also told detectives that after being kicked out the first time, he met his father at a bar.  (*Id*.)  Detectives never interviewed Purdie's father.  (*Id*.)

Wilson.  (*Id*.)  Mandeville was Mason's 98 year-old grandfather and lived at the Stillman House.

(*Id*.)  Mason returned to the Stillman House around 10:00 a.m. on April 10 to cook breakfast for

Mandeville.  (*Id*.)  It was at that point she discovered the bodies.  (*Id*.)

      Mason told Hoffner that Wilson was staying at the Stillman House for the weekend and

that throughout that time she observed Wilson in Tyrone Mason's bedroom smoking cocaine.

(*Id*.)  She also stated that Wilson was "wearing a tan waist length windbreaker type jacket."  (*Id*.)

Mason left around 4:00 a.m. because she was tired, could not sleep and because Tyrone Mason

was "crazy" and always talked "about sticking knives in people."  (*Id*.)  According to Mason,

Tyrone Mason kept "all kinds of knives and stuff" in his room.  (*Id*.)

      At 11:45 a.m. on April 10, Hoffner interviewed Vernon Gillespie ("Gillespie").  (JA

5955–57.)  Gillespie said that he smoked cocaine at the Stillman House until approximately 2:00

a.m. on April 10.  (*Id*.)  At some point before 2:00 a.m., Gillespie and Tyrone Mason left to buy

more cocaine.  (*Id*.)  Rachel Mason asked Gillespie to buy the cocaine because Goines, Wilson

and Mason "didn't have [any] money."  (*Id*.)  When Gillespie returned, he took two hits of the

new cocaine and left.  (*Id*.)  At the time he left, Gillespie stated that everyone was in Tyrone

Mason's room smoking.  (*Id*.)

      Detectives also interviewed Valyncia Craig ("Craig") on April 10.  (JA 5961–67.)  Craig

told detectives that Mason came to her house around 4:00 a.m. to stay the night.  (*Id*.)  She also

stated that she saw Wilson standing in the doorway of the Stillman House at 3:00 a.m. wearing a

green sweater with a yellow stripe.  (*Id*.)

      Detectives recovered, among other things, the following pieces of physical evidence from

the Stillman House on April 10: (1) a hatchet, approximately 1ft. 4 in. long, with a hair or fiber

on the blade; (2) a pair of scissors; (3) a knife with a bent blade and red stains; (4) a red stain

sample from the top step leading into the Stillman House; (5) a red stain sample from the door of a yellow station wagon parked in front of the Stillman House; and (6) a red stain sample from the sink in one of the bathrooms.  (JA 6050.)

### B.  April 11, 1988 Interviews, Evidence and Charges

At approximately 4:50 a.m. on April 11, Wilson came to the police station for questioning.  (JA 7152–55.)  Detective Roy J. Gibson ("Gibson") interviewed Wilson at 5:15 a.m.  (*Id*.)  During the interview, Gibson observed injuries to Wilson's hands.  (JA 2716.)  Specifically, Gibson noticed a scrape on Wilson's palm, an injury to the webbing of Wilson's hand and a scrape on his knuckle.  (*Id*.)  Wilson told Gibson that he was at the Stillman House from 7:30 p.m. on April 9 to 3:30 a.m. on April 10.  (JA 7152–55.)  Wilson told Gibson that when he left the Stillman House he was wearing: (1) tan khaki pants; (2) a black corduroy hat; (3) white Puma sneakers; (4) a black pullover shirt; and (5) a brown reversible sweater jacket, sweater on one side jacket on the other.  (*Id*.)  Wilson stated that the clothes he wore the morning of April 10 were at his mother's ("Mrs. Wilson") house.  (*Id*.)  He denied any involvement in the murders.  (*Id*.)

Wilson told Gibson that after leaving the Stillman House at 3:30 a.m., he went straight to his mother's house at 2246 Dickinson Street.  (*Id*.)  Wilson said that while at his mother's, he helped his brother move boxes and a kitchen table from the house into a U-Haul truck.  (*Id*.)  Wilson told Gibson that he then went to Robin Dyson's ("Dyson") house, where he remained until Gillespie came over and told everyone about the murders.  (*Id*.)  At that point, Wilson stated that he went back to his mother's where she told him that the police were looking to speak with him.  (*Id*.)

At some point after Wilson's interview, Detective Michael Troutner ("Troutner") prepared an affidavit of probable cause to obtain a search warrant for Mrs. Wilson's house.  (JA 6068–69.)  A judge approved the warrant and the police conducted a search at 11:10 a.m. on April 11.  (*Id.*)  The warrant granted detectives the authority to search Mrs. Wilson's home for: (1) any and all bloody clothing; (2) any cutting instruments; (3) a green sweater with a yellow stripe; (4) a black pullover shirt; (5) white Puma sneakers; (6) a black hat; (7) khaki pants; (8) a brown sweater; and (9) a tan windbreaker.  (*Id.*)  The detectives recovered a tan waist-length jacket with what appeared to be blood stains and one pair of tan pants.  (*Id.*)  The jacket was found in the basement of Mrs. Wilson's home.  (*Id.*)  The inventory sheet for this search warrant was typed, indicating it was not filled out at the scene.[6]  (*Id.*)

While detectives searched Mrs. Wilson's house, Hoffner interviewed Gillespie for a second time at 11:35 a.m. on April 11.  (JA 5958–60.)  Gillespie told Hoffner that he saw Wilson at Dyson's house the night of April 10.  (*Id.*)  When Gillespie arrived and told everyone about the murders, Wilson acted like he did not know what was going on.  (*Id.*)  Gillespie also told Hoffner that Wilson had changed clothes from the night before.  (*Id.*)  After leaving Dyson's, Gillespie received a phone call from Tanya Tindal ("Tindal"), the mother of Wilson's two children, around 3:30 a.m. on April 11.  (*Id.*)  Tindal told Gillespie that Wilson was sitting in her home getting high and that she wanted to get herself and the children out of the house.  (*Id.*)  Gillespie then called Wilson's mother, who told Gillespie that she went over to Tindal's to pick up Tindal and the children.  (*Id.*)  Mrs. Wilson told Gillespie that when she arrived, Wilson was sitting in the kitchen getting high and stated that he did not want to talk to the police.  (*Id.*)

---

[6]     In February 2013, Tyrone Haynes ("Haynes") submitted an affidavit stating that police interviewed him "in front of [Wilson's] house" in 1988.  (JA 2117–18.)  Haynes stated that he told police the jacket was "one that [he] wore very often."  (*Id.*)  Haynes also stated that he last saw the jacket the "day or evening" before the murders.  (*Id.*)

Gillespie told Hoffner that after speaking with Mrs. Wilson, he went to Tindal's house and after approximately forty minutes, persuaded Wilson to go speak with police.  (*Id*.)

Detective Richard Bova ("Bova") interviewed Mrs. Wilson at 12:10 p.m. on April 11. (JA 5979–84.)  Mrs. Wilson stated that she was present for the search that morning, but did not recognize the bloody jacket because it had already been "balled up in a bag."  (*Id*.)  Mrs. Wilson told detectives that she did not see Wilson helping his brother move the morning of April 10 as Wilson stated in his interview.  (*Id*.)  When Mrs. Wilson asked her son if he was involved in the Stillman incident, Wilson told her "not to worry."  (*Id*.)

Hoffner interviewed Tindal at 12:30 p.m. on April 11.  (JA 5969–73.)  Tindal stated that when she walked into her house around 1:00 a.m. that morning she observed Wilson sitting naked at her table smoking cocaine.  (*Id*.)  She noticed a scratch on Wilson's chest and asked Wilson "if he got it from his woman."  (*Id*.)  He responded by saying "I ain't been around no women."  (*Id*.)  When Tindal went upstairs to put the children to bed, she noticed that Wilson had brought with him a tan shoulder bag and a dark brown suit bag.  (*Id*.)  At that point, she noticed what appeared to be blood on Wilson's white sneakers.  (*Id*.)  Tindal also saw blood on Wilson's brown pants in her dirty clothes bin.  (*Id*.)  Tindal told Mrs. Wilson about the sneakers and the pants when Mrs. Wilson arrived.  (*Id*.)  Tindal stated that Mrs. Wilson then took the pants, put them in a yellow bag and left with them.  (*Id*.)  The police never recovered the purportedly blood-stained pants or sneakers.

Tindal told Hoffner that Wilson often stayed in his mother's basement.  (*Id*.) Additionally, after speaking with Wilson's sister earlier that morning, Tindal discovered that Wilson had visited his mother's house at 8:00 a.m. the morning of April 10.  (*Id*.)  Tindal also

8

told Hoffner that Wilson "beat her up" a number of times and sometimes was in such a rage that he would foam at the mouth.  (*Id*.)

After the interviews of Gillespie, Tindal and Mrs. Wilson, detectives interviewed Dyson and Aurelia Moore ("Moore"), Dyson's live-in girlfriend.  (JA 5976–78, 5987–92.)  Dyson told detectives that Wilson came to his house around 8:30 a.m. the morning of April 10.  (JA 5987–92.)  Dyson observed a scrape on Wilson's hand that "looked like he had been in a fight."  (*Id*.)  When Wilson asked Dyson for a Band-Aid, Dyson told him he did not have one.  (*Id*.)  At some point that morning, Wilson left Dyson's and returned with Band-Aids, orange juice and a bottle of alcohol.[7]  (*Id*.)  Dyson told detectives that when Wilson arrived that morning, he had "a lot of money."  (*Id*.)  Specifically, Dyson observed that Wilson "had an envelope with a lot of bills in it" and that "he also had some folding money on the side."  (*Id*.)  Wilson gave Dyson a total of $70 that day to buy cocaine for everyone to smoke, but did not charge anyone.  (*Id*.)  Moore also told detectives that Wilson had a "fresh" scratch on his knuckle and that he asked for a Band-Aid.  (JA 5976–78.)  Moore observed that Wilson had a leather suitcase bag and another cloth bag that was light brown or tan.  (*Id*.)  Moore told detectives that when he arrived, Wilson was wearing white sneakers and a pair of brown pants.  (*Id*.)

After these interviews, detectives prepared two more affidavits of probable cause to obtain two additional search warrants.  (JA 6066–67, 6070–71.)  A judge approved both warrants.  (*Id*.)  The first warrant granted police the authority to take pictures of Wilson's injuries and samples of his blood, hair and fingernail scrapings.  (JA 6066–67.)  Police executed this search warrant at 2:40 p.m. on April 11, recovering a sample of Wilson's hair, four vials of his blood and one blue sock worn by Wilson.  (*Id*.)

---

[7]     Dyson later corrected his original statement to police by saying he meant rubbing alcohol.  (JA 3777–78.)

The second search warrant granted police the authority to search Tindal's home for any bloody clothing including a black corduroy hat, a black shirt, brown pants, a tan shoulder bag, white sneakers with blood on them and any drugs or drug paraphernalia.  (JA 6070–71.)  Police executed this warrant at 5:00 p.m. on April 11, recovering a blue corduroy hat, a travel bag with various papers in it and a brown garment bag with two shirts inside.  (*Id*.)

At some point on April 11, detective Hoffner filled out Wilson's arrest report.  (JA 6089–90.)  The listed "time of arrest" on the report is 4:50 a.m. on April 11, 1988.  (*Id*.)  Wilson's arrest report also lists the time he was "slated" as 10:55 p.m. on April 11, 1988.  (*Id*.)  Hoffner testified that the time Wilson was "slated" represented the time he was officially put in the arrest book after all the arrest paperwork had been completed.  (JA 2139.)  Hoffner recommended that Wilson be charged, and on April 11, 1988, Assistant District Attorney Leonard Deutchman filed a criminal complaint formally charging Wilson with the murders of Tyrone Mason, Goines and Sewell.  (JA 6086–88.)

### C.  Subsequent Interviews, Evidence and Criminalistics

After Wilson was charged on April 11, detectives continued their investigation, looking for any other evidence near the Stillman House.  Specifically, detectives focused on the route Wilson would have taken as he walked from the Stillman House to his mother's house.  (JA 6066–70.)  On April 13 at approximately 12:00 p.m., detectives recovered along that route a carpenter's hatchet from a sewer at the corner of Taylor and Dickinson streets.  (JA 6056–57.)  Detectives noticed a red stain and also what appeared to be hair on the blade of the hatchet.  (*Id*.)

Detectives interviewed Wilson's brother, Jonathan Wilson, on May 14.  (JA 6018–19.)  Jonathan Wilson told detectives that he saw Wilson the morning of April 10 at their mother's house, but that Wilson never helped him move anything into the U-Haul truck.  (*Id*.)  Detectives

also interviewed Craig a second time on May 14.  (JA 5968.)  Craig told detectives that Sewell always kept an envelope full of money in her pocketbook.  (*Id.*)

The police sent all of the physical evidence to the criminalistics laboratory for testing. Brenner tested the evidence.  (JA 6058–65.)  From the blood samples provided, Brenner was able to ascertain ABO Blood Types[8] for Wilson and all three victims.  (*Id.*)  Brenner also conducted two enzyme tests: a phosphoglucomutase ("PGM") test and a peptide azide ("Pep-A") test.[9]  (*Id.*) He created a report comparing the results of the evidence tested to the known blood and enzyme types of Wilson and the victims.  (*Id.*)  Brenner summarized the results in the chart below:[10]

| SOURCE | ABO Type | PGM | Pep-A |
|---|---|---|---|
| Cynthia Goines | B | 1 | 1 |
| Tyrone Mason | A | 2 | 1 |
| Dorothy Sewell | A | 2 | 1 |
| Harold Wilson | B | 2 | 1 |
| Jacket (right sleeve) | A | 2 | 1 |
| Jacket (upper-middle rear) | B | ND | ND |
| Hatchet Handle (found in sewer) | A&B | ND | ND |
| Knife | A | ND | ND |

ND = Not Determined

---

[8]       ABO Blood Typing tests yield one of four "types" of blood: A, B, AB or O.  (JA 4003.)

[9]       PGM tests yield one of three enzyme types: Type 1, Type 2 or Type 2-1.  (JA 4003.)  Pep-A tests yield one of three enzyme types: Type 1, Type 2 or Type 2-1.  (JA 4007.)  Although the possible results for both enzyme tests are identical, the tests are different in that they analyze different enzymes.  (JA 4000–10.)

[10]      This is a replica of the chart included in Brenner's final report.  The only formatting change is the addition of gridlines separating the individual columns and rows.

(*Id.*)  According to his tests, Brenner matched the blood and enzyme types found on the right sleeve of the jacket with the blood and enzyme types of both Tyrone Mason and Sewell.  (*Id.*)  Although he was not able to determine the PGM or Pep-A results for the remaining evidence, Brenner was able to determine: (1) the ABO Blood Type found on the upper-middle rear of the jacket matched the ABO Blood Types of both Wilson and Goines; (2) the ABO Blood Types on the hatchet handle, identified as both A and B, could have matched any of the victims or Wilson; and (3) the ABO Blood Type on the knife matched the ABO Blood Types of Tyrone Mason and Sewell.  (*Id.*)

Brenner took notes while conducting the various tests.  (JA 6904–24.)  His notes reveal that he conducted fabric impression tests to see if any observable fabric pattern in the blood on the hatchet matched the clothes of either Wilson or the victims.  (*Id.*)  Brenner's notes reflect that the observable impressions on the hatchet did not match any of the victims' or Wilson's clothes. (*Id.*)  The results of the fabric impression test were not included in Brenner's final criminalistics report, and they were not disclosed to prosecutors or Wilson's counsel.  (JA 6058–65.)

Brenner's notes also reveal that he conducted additional tests on the jacket.  (JA 6904– 24.)  Specifically, Brenner conducted an initial PGM test on the blood found on the right sleeve which resulted in a finding of: "Type 1 or Type 2 (mixture??)."  (*Id.*)  Below this finding, Brenner wrote down: "(repeat)."  (*Id.*)  Brenner conducted another PGM test on the right sleeve which indicated that the blood was: ABO Type A; PGM Type 2; and Pep-A Type 1.  (*Id.*)  He was thus able to match Tyrone Mason and Sewell's blood and enzyme types with those on the right sleeve of the jacket only after his second test.  The result from the first test was neither included in Brenner's final criminalistics report nor disclosed to prosecutors or Wilson's counsel. (JA 6058–65.)

Throughout the relevant time period, the Philadelphia Police Department's forensic laboratory maintained a policy of not requiring its laboratory technicians to provide their notes to prosecutors or criminal defendants.  (JA 2511–12.)  Rather, technicians would take notes as they conducted tests and then compile everything into a final report.  (JA 2511.)  These final reports would typically include the type of analysis conducted, the item tested, a description of the item, where the item came from, the submitting officer, results of the testing and any conclusions that could be drawn from the results.  (*Id*.)

## II.  Jury Selection and the Policies, Practices and Training of the DAO

### A.  Office Structure and the McMahon Tape

Ronald Castille ("Castille") was the District Attorney from 1986 to 1991.  (JA 80.) William Chadwick ("Chadwick") was Castille's First Assistant.  (*Id*.)  As admitted by the DAO in its answers to Wilson's interrogatories, both Castille and Chadwick were "policymakers" of the DAO during those years.[11]  (JA 5304.)

Under the DAO's "organization chart," all Assistant District Attorneys ("ADAs") reported to Unit Chiefs.  (JA 80.)  For example, ADAs working in Homicide would report to the Homicide Unit Chief.  (*Id*.)  Unit Chiefs then reported to a Deputy who oversaw a division of units.  (*Id*.)  In 1988 and 1989, the "Trials Division" was made up of the following units: Homicide, Major Trials, Felony Waiver, Municipal Court, Rape and Child Abuse.  (*Id*.) Deputies reported to Chadwick, who in turn reported directly to Castille.  (*Id*.)

The DAO's policy with regard to jury selection derived from its general goal of obtaining convictions that were "sustainable and [could] survive an appeal."  (JA 88.)  Given that

---

[11]     On April 22, 2013, Castille, then-Chief Justice of the Pennsylvania Supreme Court, filed a motion to quash a subpoena ordering him to testify at a deposition for this case.  (ECF No. 137.)  Our Court granted Castille's motion, but provided that he must identify someone who would know of the DAO's policies during Castille's tenure.  (ECF No. 144.)  He identified Chadwick and the parties agreed that Chadwick is a policymaker for purposes of the Court's analysis.  (JA 5304.)

baseline, the "policies and practices" of not "exclu[ding] minorities from juries solely because they're minorities had been set in concrete long before Castille became the D.A." (JA 90.) According to Chadwick, the policy "had become so part of the fabric of the office that it really was a practice." (JA 88.) It was so much a part of "the office culture" that the DAO did not "spen[d] a whole lot of time on *Batson* implementation because [the DAO] viewed it as part of the existing culture that [it] had inherited from the Rendell Administration."[12] (JA 88, 90.)

The DAO did not maintain a "formal" training program with regard to *Batson* or jury selection generally. (JA 124.) Rather, "[t]he Office's working assumption is that lawyers know the law. *Batson* is the law." (JA 133.) Despite the lack of a "formal" *Batson* training program in 1988 and 1989, ADAs received jury selection training in three primary ways: (1) observing and learning from other ADAs; (2) attending lectures conducted by the Director of Training, Bruce Sagel ("Sagel"); and (3) mentorship and supervision provided by Unit Chiefs.[13] (JA 84, 87, 123–25, 694.) Chadwick testified that "[m]ost of the expertise that the [ADAs] acquired was from each other." (JA 83.) For example, "one of the ways that you would learn how to [select a jury]," would be to "go watch [ADAs] try cases." (JA 87.)

In 1986 or 1987, the Deputy of the Juvenile Division, Albert Toczydlowski, asked McMahon to give a presentation on jury selection to junior ADAs.[14] (JA 733, 1469–1541.) Approximately ten ADAs attended the lecture. (JA 735.) McMahon's presentation was

---

[12] Edward Rendell ("Rendell") was Castille's predecessor, serving as the District Attorney from January 1978 to January 1986. (JA 53.)

[13] The DAO's 30(b)(6) representative, John Delaney Jr., also testified that ADAs were trained on jury selection by: (1) keeping abreast of new decisions and changes in the law on their own or through updates from superiors or the Law Division; (2) attending Continuing Legal Education courses; and (3) using materials their Unit or the DAO prepared and distributed. (JA 123.) For example, three weeks after *Batson* was decided, Gaele McLaughlin Barthold ("Barthold"), the Deputy District Attorney for the Law Division of the DAO, circulated a memorandum summarizing *Batson* to all Deputies, Unit Chiefs and ADAs. (JA 157–68.) Memoranda such as this were circulated whenever there were major changes in the law. (JA 87.)

[14] The exact date on which the presentation was given is unknown. The parties do agree, however, that the presentation occurred after *Batson* was decided and before Wilson's trial. (Oral Arg. 123:1–8.)

videotaped ("the McMahon Tape") and kept in a training room for ADAs.  (JA 736, 870.)  In the

lecture, McMahon stated that "the only way you're going to do your best is to get jurors that are

as unfair and more likely to convict than anybody else in that room."  (JA 1514.)

McMahon also discussed "rules" that he believed ADAs should follow when selecting

jurors.  (JA 1471.)  For example, McMahon advocated striking young black women:

> [I]n my experience, black women, young black women are very bad.  There's an
> antagonism.  I guess maybe because they're downtrodden on two respects, they
> got two minorities, they're women and they're and [*sic*] blacks, so they're
> downtrodden in two areas.  And they somehow want to take it out on somebody,
> and you don't want it to be you.  And so younger black women are difficult, I've
> found.

(JA 1525.)  McMahon also advised against selecting black jurors from low-income

neighborhoods in Philadelphia.  Specifically, McMahon stated:

> [L]et's face it, again, there's the blacks from the low-income areas are less likely
> to convict.  It's just—I understand it.  It's [*sic*] understandable position.  There
> is a resentment for law enforcement, there's a resentment for authority and, as a
> result, you don't want those people on your jury.  And it may appear as if you're
> being racist or whatnot, but again, you are just being realistic.  You're just trying
> to win the case.

(JA 1515–16.)  At one point, McMahon told the ADAs: "[W]hen they call the names out, okay,

Juror No. 1, No. 20, Reynard Boiken.  I know I'm not taking Reynard; I can tell that already."

(JA 1493.)

McMahon did not, however, advocate for an all-white jury.  Referencing his own

experience, McMahon stated: "I've seen DAs strike them because they're black, and that's kind

of like a rule, 'Well they're black, I've got to get rid of them.'"  (JA 1524.)  Rather, McMahon

believed that "a jury of like eight whites and four blacks is a great jury, or nine and three."  (JA

1527.)  In order to get that configuration, McMahon advised ADAs to "[c]ount the blacks and the

whites" when the jurors came into the room.  (JA 1534–35.)  He also advised that "in selecting

blacks, again you don't want the real educated ones, again." (JA 1523.)  To this end, McMahon

provided: "[i]f you're sitting down and you're going to take blacks, you want older blacks.  You

want older black men and women, particularly men.  Older black men are very good." (*Id.*)

McMahon also advocated selecting black jurors from the south because "they're law and order."

(JA 1524–25.)

Toward the end of the presentation, McMahon instructed the ADAs on *Batson*.

Specifically, McMahon stated that *Batson* was "very limited to the facts of that particular case,

because you had a racial case, the prosecutor struck all blacks, the—every black on the panel."

(JA 1537.)  McMahon advised that "to avoid any problems" with *Batson*, ADAs should

"question [black jurors] at length."  (JA 1537–38.)

### B.  Other Jury Selection Training

#### i.  The Director of Training

The DAO also maintained a training program to "orient the new ADAs to the office."

(JA 84.)  Sagel testified that Chadwick asked him to be the Director of Training in 1986 after

Sagel had expressed interest in the position.  (JA 697.)  Sagel gave at least one lecture on jury

selection in either 1986 or 1987.[15]  (JA 699–701.)  When asked during his deposition whether he

instructed ADAs to take "acceptable black jurors" in the first round of jury selection, Sagel

stated:

> I couldn't have been a racist when I'm telling them that many, many—and even
> more so today than back 30 years ago that blacks make excellent Commonwealth
> jurors, and I believe somewhat in that.  It's because many times a black juror will
> bring along a reluctant white juror depending on the circumstances.  So depending
> on the case, depending on the age, depending on who your defendant is,

---

[15]     The record is unclear as to how many jury selection lectures Sagel gave.  At his deposition he recalled only
one in the mid-1980s.  (JA 698–701.)  Later in the deposition, Sagel admits that he also gave a jury selection lecture
in 1990 that was the subject of a Philadelphia Magazine article which criticized Sagel's jury selection tactics as
racially motivated.  (JA 702.)  Sagel subsequently sued Philadelphia Magazine.  (*Id.*)

depending on what the facts of the case, blacks make excellent jurors in the appropriate case.

(JA 710.)  Sagel also stated that "you don't ever want to think like a lot of [DAs] or a lot of

defense lawyers that you're just not going to put a black on."  (*Id.*).

When asked whether he told ADAs that older black men make excellent jurors, Sagel

stated:

> I'm sure that I mentioned age of the people and older black men who had property or were maybe raised in the South depending on where they came from and other things, that an older black man was usually a pretty good Commonwealth juror as opposed to having a 21 year old who probably hates the police and might not make a good juror.

(JA 711.)  Sagel was also asked whether he believed that some black jurors are helpful to have

on the jury.  (JA 712.)  Sagel responded:

> I didn't say it that way and I don't know if I used the word helpful, but there's no doubt that black jurors are where a lot of crime happens in Philadelphia.  Some happens in white areas, black areas.  They know what's going on more so today, and they don't like young punks or whatever robbing or burglarizing or whatever.

(*Id.*)  Finally, when asked whether he instructed ADAs to count males, females, blacks and

whites in the jury pool, Sagel stated: "I don't know exactly what I said on that, but in going out

to see the jury, obviously there's a big difference in race, there's a big difference in gender,

and—you know, if you're going to take a look at them, try to remember what you got."  (JA

707.)

### ii.  Unit Chiefs

ADAs also received "on-the-job" training from Unit Chiefs who were responsible for

overseeing ADAs in their unit and being available for questions regarding trial strategy.  (JA 83,

123–24.)  Each unit held weekly or monthly meetings as needed where they would discuss,

among other things, jury selection.  (JA 125.)  Barbara Christie ("Christie") was the Unit Chief

17

for Homicide in 1988 and 1989.  (JA 83.)  Christie was appointed by Castille with input from

Chadwick and other Deputies.  (JA 81.)

Pennsylvania state and federal courts have analyzed Christie's jury selection practices.[16]

For example, in *Commonwealth v. Brown*, 417 A.2d 181 (Pa. 1980), the Pennsylvania Supreme

Court examined Christie's use of peremptory challenges under the *Swain* standard.  The majority

first articulated the burden for a plaintiff seeking to establish an equal protection violation under

*Swain*:

> The presumption [that the prosecutor is using the State's challenge to obtain a fair
> and impartial jury] is overcome when the prosecutor in a county, in case after
> case, whatever the circumstances, whatever the crime and whoever the defendant
> or the victim may be, is responsible for the removal of [blacks] who have been
> selected as qualified jurors by the jury commissioners and who have survived
> challenges for cause, with the result that no [blacks] ever serve on petit juries.

*Brown*, 417 A.2d at 186.  Despite Christie's undisputed use of all sixteen peremptory challenges

against potential black jurors, the court ultimately found no equal protection violation because

the plaintiff had not demonstrated that Christie, in case after case, struck black jurors because of

their race.  *Id*. at 186–87.

In November 1981, Christie prosecuted Edward Sistrunk ("Sistrunk") for murder.

During jury selection, Christie exercised thirteen peremptory strikes against every potential black

juror.  (JA 8840–51.)  Throughout jury selection Christie kept a running tally of how many

blacks and whites were left on the panel.  (*Id*.)  Sistrunk, who was black, was convicted by an

all-white jury.  (*Id*.)

In the 1991 case of *Diggs v. Vaughn*, No. 90-2083, 1991 WL 46319 (E.D. Pa. Mar. 27,

1991), our Court issued a writ of habeas corpus to a defendant Christie prosecuted.  (JA 8824–

---

[16]  Although the opinions referenced by the Court do not address Christie by name, it is clear from other court
filings that Christie was the prosecutor in each of the underlying criminal cases.  *See* Brief for Appellant DAO at 9
n.5, 14 n.6, *Sistrunk v. Vaughn*, 96 F.3d 666 (3d Cir. 1996) (No. 95-1848).

29.)  The court issued the writ after an evidentiary hearing was held before a magistrate judge on

the defendant's *Batson* claim.  (*Id*.)  The magistrate found that "examination of the notes of

[Christie] taken during jury selection . . . reveals that she kept a running tabulation of the number

of blacks left on the jury after each challenge was exercised."  (JA 8835.)  He stated "[t]he

prominence of this racial tabulation throughout the notes provides a telling indication of the

predisposed prejudice of [Christie] towards blacks on the jury."  (*Id*.)  In adopting the magistrate

judge's recommendation, the district court noted that "the record demonstrates conclusively that,

at each trial, the prosecutor kept careful records of the race of each prospective juror, and a

running tally of how many persons of each race remained on the venire for possible selection."

(JA 8826.)  The court therefore found that "race seems to have featured prominently in the

thought process of the trial prosecutor."  (*Id*.)

**III.  Wilson's Trial and Post Conviction Proceedings**

    **A.  Wilson's Trial**

      During *voir dire*, McMahon used eleven peremptory challenges on black jurors and six

peremptory challenges on jurors of other races, leaving three peremptories unused.  (JA 4458–

63.)  McMahon also used one peremptory challenge on a black juror during the selection of

alternate jurors.  (*Id*.)  Ultimately, Wilson's jury consisted of four black and eight white jurors—

the ratio McMahon advocated in his training video.  (*Id*.)

      During its case in chief the prosecution called, among others, Mason, Gillespie, Dyson,

Tindal and Brenner as witnesses.[17]  (JA 3451–4115.)  Mason testified that at some point early in

the morning of April 10 she left the Stillman House to get matches.  (JA 3594.)  On her way out,

Mason saw a jacket on the bannister and asked whose it was.  (*Id*.)  Wilson told Mason that the

---

[17]     Most of the testimony from these witnesses largely reiterated what each witness told police in their initial statements.  The Court accordingly addresses only the testimony pertinent to the Court's analysis *infra*.

jacket was his and proceeded to grab his keys out of the pocket.  (JA 3594–95.)  Mason

identified the jacket in court as the one she wore that night when she left to get matches, but

noted that it did not have blood on it when she wore it.  (JA 3597–99.)  Mason also testified that

as she left around 4:00 a.m., she locked the door on her way out.  (JA 3606.)  In his closing,

McMahon argued that because the door was locked and there were no signs of forced entry, the

murderer must have already been in the house.  (JA 4117–4252.)  Mason also identified the

hatchet found in the sewer as the hatchet Tyrone Mason kept in his room.  (JA 3620.)  She

testified that she saw the hatchet in Tyrone Mason's drawer when she was looking for matches,

and was able to identify the hatchet as Tyrone Mason's because of a particular engraving on the

handle.  (JA 3620–21.)

On cross-examination, Wilson's counsel questioned Mason about the locking mechanism

on the door at the Stillman House.  (JA 3669.)  Wilson's counsel elicited testimony that the door

sometimes appeared locked, but was not actually locked.  (JA 3669–70.)  Additionally, Wilson's

counsel established that Mason had an open drug case at the time.  (JA 3673.)  Mason denied,

however, that any deals were offered to her in exchange for her testimony against Wilson.  (JA

3682.)

Gillespie identified the jacket as the one he saw lying on the bannister at the Stillman

House.  (JA 3744.)  On cross-examination, Gillespie testified that the jacket belonged to Tyrone

Haynes ("Haynes").  (JA 3757.)  Gillespie stated that he last saw Haynes wearing the jacket two

weeks prior to the murders.  (JA 3761.)  Additionally, Gillespie stated that the last time he saw

Haynes was the Thursday before the murders.  (JA 3762.)

Dyson testified that he was not expecting Wilson when he came over on the morning of

April 10.  (JA 3767–78.)  Dyson reiterated his testimony about Wilson's injury, request for a

Band-Aid and that he had an envelope full of money.  (JA 3775–81.)  Tindal also testified

consistent with the statement she gave to detectives on April 11, where she spoke of Wilson's

bloody pants and how his mother put them in a bag and took them away.  (JA 3918–21.)  On

cross-examination, Tindal stated that she felt threatened at the time she gave her statement

because detectives questioned her for six hours and threatened to take her children away.  (JA

3926–27.)  She stated that Hoffner was not the detective who threatened her, but rather it was an

officer standing guard outside her interview room.  (*Id.*)  At the end of her testimony, Tindal

affirmed that she told detectives the truth in her statement.  (JA 3945–47.)

Brenner's testimony consisted largely of his explanation of how he went about testing the

evidence included in his criminalistics lab report.  He testified about the percentages of the

population that would have certain ABO Blood Types in combination with the specific PGM and

Pep-A Types.  (JA 4008–13).  Specifically, Brenner testified that the blood stain on the jacket

sleeve matched the ABO, PGM and Pep-A types of both Tyrone Mason and Sewell.  (JA 4019–

26.)  This specific combination of blood and enzyme types, according to Brenner, occurred in

roughly 1.5 percent of the population.  (JA 4011.)  Because Wilson's counsel did not have

Brenner's notes, Brenner was not cross-examined on the part of those notes which reflected an

initial test showing that the PGM result was "Type 1 or Type 2 (mixture??)."  (JA 6904–24.)

Brenner was, however, cross-examined on the fact that DNA testing existed at the time and that

the lab had sent evidence out for DNA testing before, but did not do so in Wilson's case.  (JA

4033–35.)

On October 4, 1989, the jury found Wilson guilty of three counts of first-degree murder

and one count of possessing an instrument of crime.  (JA 1091–1101.)  Wilson did not testify

during the trial.  During the penalty phase hearing, however, Wilson acknowledged wearing the

bloody jacket at the crime scene.  (JA 1141–42.)  Wilson was thereafter sentenced to death.  (JA 1132–74.)

### B.  Post-Conviction Proceedings

Wilson filed post-trial motions asserting, among other things, that his constitutional rights under *Batson* were violated.  (JA 5785–5926.)  The trial court heard Wilson's motions on October 3, 1991, and ultimately denied them in December 1993.  (JA 5786.)  Wilson appealed his case directly to the Pennsylvania Supreme Court, which affirmed the trial court's decision in February 1996.  (*Id.*)

District Attorney Lynne Abraham ("Abraham") learned of the McMahon Tape and publicly disclosed it in March 1997.  (JA 6–9.)  Abraham also issued a memorandum to all ADAs following the tape's release:

> The purpose of this memo is to re-state what has been and will continue to be the District Attorney's Office policy with regard to jury selection and the use of peremptory challenges.  Peremptory challenges shall not be used to exclude members of any race, religion, ethnic group or gender from service on a jury on account of race, religion, ethnicity or gender.
>
> It is our primary goal to seek justice by insuring [*sic*] that every defendant receives a fair trial.  In order to achieve that goal you are again reminded of the necessity that you follow the dictates of *Batson v. Kentucky*.  A copy of the opinion of the Court is attached to this memo.

(JA 169.)  Abraham directed an investigation into who in the office had seen the video.  (JA 8.) ADAs were required to "self-report" if they had seen the lecture, and if so, how it affected their jury selection practices.  (*Id.*)  Abraham testified that approximately a dozen people said they had seen it and all of them denied having been influenced by it.  (JA 8, 609.)

After learning of the McMahon Tape, Wilson filed for post-conviction relief in August 1997.  (JA 5785–5926.)  Wilson alleged, among other things, that his rights under *Batson* were violated during jury selection at his criminal trial.  (*Id.*)  Wilson filed a supplement to his petition

in October 1997, arguing that "[t]he Commonwealth, through the acts of prosecutor Jack McMahon, exercised its peremptory strikes in a racially discriminatory manner to exclude African Americans from participation on the jury." (JA 8133.) Wilson contended that this violation entitled him to a new trial. (JA 8134.)

The Pennsylvania Supreme Court vacated its prior decision affirming the trial court's dismissal of Wilson's *Batson* claim and remanded for an evidentiary hearing in light of the newly discovered McMahon Tape.[18] (JA 491.) The Philadelphia County Court of Common Pleas ("PCRA Court") held the evidentiary hearing on Wilson's *Batson* claim. (JA 4254–99.) McMahon testified over the course of two days at the hearing about his reasons for peremptorily striking certain jurors in Wilson's case, and also his instruction in the McMahon Tape. (*Id.*) The post-conviction proceedings included discovery, briefing and oral argument by both Wilson and the Commonwealth. (JA 488–595, 1177–1217, 4254–4457.) On January 17, 2003, the PCRA Court ruled that:

> Mr. Wilson is entitled to a new trial because of the Commonwealth's violation of the [*sic*] *Batson*. Court finds that there was definitely an attempt on the part of the Commonwealth to preempt jurors because of their African American race, that the neutral reasons given were not satisfactory. It was obvious in light of cross-examination that white jurors were accepted on the same basis on which black jurors had been peremptorily challenged and therefore, I find that the reasons given were pretextural [*sic*] and a new trial must be granted.

(JA 1208–09.) The PCRA Court stated its decision from the bench and did not write an opinion. (*Id.*) The Commonwealth chose not to appeal the PCRA Court's decision and Wilson was granted a new trial.

---

[18]     In 2000, the Pennsylvania Supreme Court decided *Commonwealth v. Basemore*, 744 A.2d 717 (Pa. 2000). In that case, the court held that an evidentiary hearing was required on a defendant's *Batson* claim based on newly discovered evidence in the McMahon Tape. *See id.* at 739. Like Wilson, the defendant in *Basemore* was prosecuted by McMahon. *See id.* at 727.

Wilson's re-trial for the murders of Goines, Tyrone Mason and Sewell took place in November 2005.  (JA 4465–68.)  Kevin Knox ("Knox"), a forensic scientist in the Philadelphia Police Department, performed DNA tests on, among other things, the cotton swabs containing stains from the hatchet and blood swatches taken from the right sleeve of the jacket.  (JA 1343–56.)  Many of Knox's tests yielded no DNA results.  (JA 1344, 5190–92, 5195.)  He explained that the lack of results could have resulted from: (1) an insufficient quantity of DNA on the samples; (2) degradation of the sample in the 17 years since it had last been tested; or (3) the exhaustion of DNA in the sample stemming from the previous testing done in the 1980s.  (JA 1345.)  While Knox's report noted that Tyrone Mason was excluded as a source of DNA from the jacket sleeve, he also admitted that he could not exclude the possibility that the DNA did, in fact, come from Tyrone Mason.  (JA 1349–50.)  Specifically, Knox noted that the age and degradation of the evidence could have caused the result which led him to conclude Tyrone Mason was not the source.  (JA 1355–56.)  The Court also excluded Wilson's prior penalty-phase testimony in which he acknowledged wearing the bloody jacket at the crime scene.  (JA 1233, 1339.)  After three days of deliberations, the jury was "still entrenched in [its] position[]" and had reached a "standstill."  (JA 1457.)  The trial court instructed the jury to continue deliberating and on November 15, 2005, the jury returned a verdict of not guilty on all charges. (JA 1457–58.)

## IV.  Procedural History

Wilson filed his first complaint *pro se* on March 9, 2005.  (ECF No. 14.)  After Defendants[19] filed motions to dismiss on May 9, 2005 (ECF Nos. 21–22), Wilson asked to stay the proceeding until he acquired counsel.  (ECF No. 23.)  On June 2, 2006 the Court dismissed

---

[19]      Wilson's first complaint alleged claims against Castille, Abraham, McMahon, the DAO and the City.

Wilson's case without prejudice for failure to prosecute.  (ECF No. 31.)  On June 1, 2009, Wilson's current counsel entered its appearance.  (ECF Nos. 49–51.)

Wilson filed an amended complaint on July 15, 2009.  (ECF No. 57.)  The DAO Defendants[20] filed a motion to dismiss (ECF No. 58) which the Court granted in part and denied in part.  (ECF No. 77.)  Specifically, the Court denied the DAO's motion to the extent McMahon and Castille asserted defenses of absolute and qualified immunity.  (*Id*.)  McMahon and Castille appealed the Court's ruling.  The Third Circuit Court of Appeals reversed, holding that Wilson's allegations against McMahon and Castille were not pled with the specificity required by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The Third Circuit instructed, however, that Wilson be allowed to amend his complaint to comport with the pleading requirements.  *See Wilson v. City of Philadelphia*, 415 F. App'x 434, 437 (3d Cir. 2011).

Wilson filed his second amended complaint on May 20, 2011.  (ECF No. 89.)  The DAO moved to dismiss the complaint on July 28, 2011 (ECF No. 96), while the City answered the pleading on September 20, 2011.  (ECF No. 100.)  On February 22, 2012, the Court granted the DAO's motion to the extent it alleged state law claims against current District Attorney Seth Williams.  (ECF No. 105.)  On January 28, 2013, the DAO filed a motion for judgment on the pleadings (ECF No. 121) which the Court denied on May 9, 2013.  (ECF No. 155.)

Wilson filed his motion for summary judgment against the DAO on August 7, 2015, seeking to apply offensive collateral estoppel to bar relitigation of his equal protection claim.[21]  (ECF No. 212.)  The DAO and the City filed their respective motions for summary judgment that same day.  (ECF Nos. 211, 213.)  Wilson filed his responses to the City and DAO's motions on

---

[20]     The DAO Defendants in Wilson's amended complaint were Castille, Abraham and McMahon.

[21]     The Court granted Wilson's motion in a separate opinion.  *See Wilson v. City of Philadelphia, et al.*, No. 04-05396 (E.D. Pa. Apr. 8, 2016) (ECF No. 247); *Infra* Part VI.B.

October 6 and October 8 respectively.  (ECF Nos. 218, 224.)  The DAO responded to Wilson's

motion on October 7, 2015.  (ECF No. 222.)  All parties then filed their respective reply briefs.

(ECF Nos. 230–31, 234.)

The case was reassigned to this Court on January 20, 2016 after Judge Restrepo's

appointment to the Third Circuit.  (ECF No. 236.)  The Court held oral argument on all motions

for summary judgment on March 4, 2016 (ECF No. 241) and has thoroughly reviewed the entire

record.

## V.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is genuine if the

evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Summary judgment is granted where

there is insufficient record evidence for a reasonable factfinder to find for the plaintiff.  *Id*. at

252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Id*.

When ruling on a motion for summary judgment, the court may only rely on admissible

evidence.  *See, e.g.*, *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999).  A

court must view the facts and draw all reasonable inferences in favor of the nonmoving party.

*See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference

based upon a speculation or conjecture does not create a material factual dispute sufficient to

defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d

Cir. 1990).  The party asserting a fact "must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).

## VI. *Monell* Claim Against the DAO

Wilson alleges a Section 1983[22] *Monell* claim against the DAO, contending that an office policy or custom of racially discriminating in jury selection caused McMahon to violate Wilson's equal protection rights under the Fourteenth Amendment.[23]  (Second Am. Compl. ¶¶ 56–67.)   The DAO contends that it is entitled to sovereign immunity.  The Court must accordingly first analyze whether the DAO is entitled to immunity under the Eleventh Amendment before reaching the merits of Wilson's *Monell* claim.

### A.  Sovereign Immunity

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Eleventh Amendment bars suits brought against state agencies and state officials in their official capacity.  *See Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990).  "[T]he party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability."  *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

The Third Circuit determines whether an entity is entitled to Eleventh Amendment immunity by examining three factors: (1) the source of funding—*i.e.*, whether payment of any

---

[22]     Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  42 U.S.C. § 1983.

[23]     In his response brief, Wilson also argues his *Monell* claim under a failure-to-train theory.  At oral argument, however, Wilson's counsel conceded that he is no longer pursuing that theory of liability.  (Oral Arg. 148:16–149:8, ECF No. 244.)

judgment would come from the state's treasury, (2) the status of the agency/individual under state law, and (3) the degree of autonomy from state regulation. *See Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989). The factors are accorded equal weight. *See Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239–40 (3d Cir. 2005).

### i. *Fitchik* Factors

The DAO conceded at oral argument that it is "funded by the City" and that "any judgment would be paid by the City." (Oral Arg. 36:2–3, ECF No. 244.) Therefore, the first *Fitchik* factor weighs against the DAO's assertion of sovereign immunity.

The second inquiry is whether state law treats the DAO as "an independent entity or as a surrogate for (*i.e.*, as an arm of) the state." *Carter v. City of Philadelphia*, 181 F.3d 339, 349 (3d Cir. 1999) (internal citations omitted). The DAO is clearly not an arm of the Commonwealth of Pennsylvania. Indeed, "Pennsylvania's Constitution *expressly* defines District Attorneys as county rather than state officers." *Carter*, 181 F.3d at 348. The second *Fitchik* factor also weighs against the DAO's assertion of sovereign immunity.

The third and final factor is the degree to which the DAO is autonomous from state regulation. *See Fitchik*, 873 F.2d at 659. "In Pennsylvania, the Attorney General . . . is without authority to replace a district attorney (who must be impeached, like other locally elected officials) and in Pennsylvania, unlike many other jurisdictions, the [Attorney General] has no inherent authority to supersede a district attorney's decisions generally." *Carter*, 181 F.3d at 353. The third *Fitchik* factor, therefore, also weighs against granting the DAO sovereign immunity.

### ii.  Prosecutorial v. Administrative Distinction

The DAO's brief is largely unresponsive to Wilson's analysis of the *Fitchik* factors.[24]

(*See generally* DAO's Mot. Summ. J. ("DAO's Mot."), ECF No. 211-2.)  The DAO instead

contends that the Court should read into the *Fitchik* factors a prosecutorial versus administrative

distinction; specifically that actions taken in a prosecutorial rather than administrative function

entitle the DAO to sovereign immunity.  (Oral Arg. 41:9–13, 42:10–12.)  The DAO relies on two

cases—*Munchinski v. Solomon*, 618 F. App'x. 150 (3d Cir. 2015) and *Carter v. City of

Philadelphia*, 181 F.3d 339 (3d Cir. 1999)—neither of which support its position.

The DAO argues that the Third Circuit in *Munchinski* read the prosecutorial and

administrative distinction into the second *Fitchik* factor when it summarized two pages of dicta

in *Carter* as "recognizing that the possibility that Pennsylvania District Attorneys could be

considered state actors to the extent that they are enforcing state law and performing other purely

prosecutorial duties."  *Munchinski*, 618 F. App'x at 157 (citing *Carter*, 181 F.3d at 352–53); (*see

also* Oral Arg. 33:19–34:4.)  This misstates the Third Circuit's decision.  In *Munchinski*, the

Appeals Court applied the three *Fitchik* factors and found that the district attorneys were not

entitled to sovereign immunity.  *See Munchinski*, 618 F. App'x. at 156–57.  Moreover, the

*Munchinski* court cited the same passage that this Court cites from *Carter*, which notes that

"Pennsylvania's Constitution expressly defines District Attorneys as county rather than state

officers."  *Id*. at 157 (quoting *Carter*, 181 F.3d at 349) (emphasis omitted).

---

[24]     Moreover, at oral argument the DAO could not reference a situation in which it successfully asserted sovereign immunity in a case analogous to this one:

> The Court: Has the District Attorney's Office in Philadelphia ever successfully asserted a sovereign immunity defense against allegations of prosecutorial misconduct or constitutional violations in the selection of a jury, or anything akin to what we're dealing with now?

> Mr. Scalera: Not to my knowledge, Your Honor.

(Oral Arg. 31:16–23.)

Although *Carter* discusses the prosecutorial versus administrative distinction in dicta, it does not reach the issue, finding the application of the *Fitchik* factors dispositive. *See Carter*, 181 F.3d at 351. "[A]pplication of our *Fitchik* factors compels us to find that in Pennsylvania the prosecutor's office is not an arm of the state either generally or with respect to the managerial functions in question." *Id.* at 351 n.38. The DAO's argument that a prosecutorial versus administrative distinction should be read into the *Fitchik* factors is incorrect and the DAO is not entitled to sovereign immunity.[25]

### B.  Municipal Liability under *Monell*

Generally, a municipality will not be held liable under the doctrine of *respondeat superior* for the misconduct of its employees. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). Rather, a municipality can only be liable under Section 1983 when a constitutional injury results from the implementation or execution of an officially adopted policy or informally adopted custom. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)). "Thus, although the municipality may not be held liable for a constitutional tort under [Section] 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." *Id.* (citing *Monell*, 436 U.S. at 694).

A successful *Monell* claim must therefore establish: (1) an underlying constitutional violation; (2) a policy or custom attributable to the municipality; and (3) that the constitutional violation was caused by the municipality's policy or custom. *See Monell*, 436 U.S. at 658. The Court has separately granted Wilson's motion for summary judgment (ECF No. 212) seeking to apply offensive collateral estoppel to bar relitigation of his *Batson* claim. *See Wilson v. City of*

---

[25]     Wilson also argues that the DAO waived sovereign immunity as it "did not raise . . . [the] defense during the eleven years that this litigation has been pending." (Pl.'s Resp. to DAO's Mot. Summ. J. ("Pl.'s Resp. to DAO") at 4, ECF No. 224.)  The Court obviously does not need to address this issue.

*Philadelphia*, No. 04-05396 (E.D. Pa. Apr. 8, 2016) (ECF No. 247).  Wilson has therefore

established the requisite constitutional violation.

In *Andrews*, the Third Circuit distinguished between policies and customs:

> Policy is made when a "decisionmaker possess[ing] final authority to establish
> municipal policy with respect to the action" issues an official proclamation,
> policy, or edict.  A course of conduct is considered to be a "custom" when, though
> not authorized by law, "such practices of state officials [are] so permanent and
> well settled" as to virtually constitute law.

*Andrews*, 895 F.2d at 1480 (citations omitted).  "In either instance, a plaintiff must show that an

official who has the power to make policy is responsible for either the affirmative proclamation

of a policy or acquiescence in a well-settled custom."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850

(3d Cir. 1990) (citing *Andrews*, 895 F.2d at 1480).

While establishing a "policy" typically requires proof of some affirmative action by a

policymaker, *see Andrews*, 895 F.2d at 1480, "custom" may be established by "evidence of

knowledge and acquiescence."  *Beck*, 89 F.3d at 971 (citing *Fletcher v. O'Donnell*, 867 F.2d

791, 793 (3d Cir. 1989), *cert. denied*, 492 U.S. 919 (1989)).  "This does not mean, however, that

the responsible decisionmaker must be specifically identified by the plaintiff's evidence.

Practices 'so permanent and well settled' as to have 'the force of law' [are] ascribable to

municipal decisionmakers."  *Bielevicz*, 915 F.2d at 850 (citing *Anela v. City of Wildwood*, 790

F.2d 1063, 1067 (3d Cir. 1986)) (quoting *Monell*, 436 U.S. at 691); *see also Boyden v. Twp. of

Upper Darby*, 5 F. Supp. 3d 731, 742 (E.D. Pa. 2014) (quoting *Bd. of Cnty. Comm'rs v. Brown*,

520 U.S. 397, 404 (1997) ("Thus, even if a custom 'has not been formally approved by an

appropriate decisionmaker', it 'may fairly subject a municipality to liability on the theory that the

relevant practice is so widespread as to have the force of law.'")).

The existence of a policy or custom, however, is insufficient on its own to establish municipal liability under *Monell*.  A plaintiff must also show that the policy or custom was the proximate cause of the injuries suffered.  *See Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984).  "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue."  *Bielevicz*, 915 F.2d at 850 (citing *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 507 (3d Cir. 1985) (stating that there must be a "plausible nexus between the policy . . . and the infringement of constitutional rights")); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).  "As long as the causal link is not too tenuous, the question [of] whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."  *Tuttle*, 471 U.S. at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190–91 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982)).  When a municipal "policy or custom" is itself unconstitutional, *i.e.*, it commands or authorizes constitutional violations, the causal connection is obvious and does not require independent proof.  *See, e.g.*, *Monell*, 436 U.S. at 694–95 (finding causation evident where policy required pregnant employees to take unpaid leaves of absence before those leaves were required for medical reasons); *see also Tuttle*, 471 U.S. at 822 (stating that "no evidence . . . needed [in such a case] other than a statement of the policy").

Whether an official has policymaking authority is a question of state law.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988).  In a claim involving the Philadelphia District Attorney's Office, "it is 'undeniable' that the District Attorney himself 'is the highest policymaker within the office.'"  *Estate of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 297 (E.D. Pa. 2015) (citation omitted).  A policymaker can, however, delegate his policymaking

authority.  *See Andrews*, 895 F.2d at 1481.  Here, the parties agree that both Castille and

Chadwick are policymakers for purposes of Wilson's *Monell* claim against the DAO.  (JA 5304.)

### i. Policy or Custom

Wilson contends that the DAO's policy of discriminating in jury selection caused a

violation of his equal protection rights.  Wilson, however, points to no "official proclamation,

policy, or edict" made by either Castille or Chadwick directing attorneys to discriminate in jury

selection.  *See Andrews*, 895 F.2d at 1480.  Rather, Wilson contends that the DAO's training on

jury selection constitutes a matter of office policy.  (Pl.'s Resp. to DAO's Mot. Summ. J. ("Pl.'s

Resp. to DAO") at 25–26, ECF No. 224.)  In support, Wilson cites *Spell v. McDaniel*, 824 F.2d

1380 (4th Cir. 1987).  The argument that a municipality's training program constitutes "policy"

as defined by *Monell* is unavailing as the Third Circuit has not adopted such a standard.  Without

an "official proclamation, policy, or edict" made by either Castille or Chadwick, Wilson fails to

establish a policy of discriminating in jury selection.  *See Andrews*, 895 F.2d at 1480.

Wilson does, however, sufficiently establish a genuine issue of material fact as to

whether the DAO had a custom of racially discriminating in jury selection.  Specifically, Wilson

points to: (1) the McMahon training video; (2) Sagel's jury selection lectures; and (3) Christie's

jury selection practices.  Taken together, these three raise an issue of fact as to whether the DAO

had a custom of racial discrimination in jury selection.  Chadwick testified that the DAO's stance

against striking minorities from juries was so much a part of "the office culture" that the office

did not "spen[d] a whole lot of time on *Batson* implementation because we viewed it as part of

the existing culture."  (JA 88, 90.)  Other record evidence could reasonably be interpreted to

contradict this.  Reasonable jurors could conclude that McMahon's training video advocates

racial discrimination in jury selection,[26] and indicates that attorneys in the DAO struck black jurors solely because of their race.  (JA 1524 ("I've seen DAs strike them because they're black, and that's kind of like a rule, 'Well they're black, I've got to get rid of them.'").)

A reasonable juror could also find Sagel's deposition testimony to be indicative of a custom.  Although he continually stated that he never instructed ADAs to discriminate in jury selection, Sagel also testified that "blacks make excellent jurors *in the appropriate case*."  (JA 710 (emphasis added).)  Additionally, Sagel echoed McMahon insofar as he thought older black men from the South were good Commonwealth jurors.  (JA 712.)  When asked whether some black jurors were helpful to have on a jury, Sagel testified that "there's no doubt that black jurors are where a lot of crime happens in Philadelphia."  (*Id*.)  Pertinent to the Court's custom analysis, however, is Sagel's acknowledgment that other ADAs refused to put blacks on juries.  (JA 710 ("[Y]ou don't ever want to think like a lot of [DAs] or a lot of defense lawyers that you're just not going to put a black on.").)

Finally, Christie's jury selection practices could evince a custom of discrimination in jury selection.  In *Commonwealth v. Brown*, the dissent criticized Christie's use of all sixteen peremptory challenges against black jurors as an "invidious type of racism which should have no place in a court proceeding in the Commonwealth of Pennsylvania."  417 A.2d at 188.  While the majority in *Brown* found no equal protection violation, that case was decided under the *Swain* standard.

In prosecuting Sistrunk, Christie exercised thirteen peremptory strikes against every available black juror.  (JA 8840–51.)  Throughout jury selection Christie kept a running tally of how many blacks and whites were left on the panel.  (*Id*.)  Additionally, our Court in *Diggs*

---

[26]     At oral argument, counsel for the DAO stated that the office denounces McMahon's techniques and strategies "in the strongest possible terms."  (Oral Arg. 87:17–23.)

issued a writ of habeas corpus to a defendant Christie prosecuted.  (JA 8824–29.)  The magistrate

found that "examination of the notes of [Christie] taken during jury selection . . . reveal[ed] that

she kept a running tabulation of the number of blacks left on the jury after each challenge was

exercised."  (JA 8835.)  He stated "[t]he prominence of this racial tabulation throughout the

notes provides a telling indication of the predisposed prejudice of [Christie] towards blacks on

the jury."  (*Id.*)  In adopting the magistrate judge's recommendation, the district court noted that

"the record demonstrates conclusively that, at each trial, the prosecutor kept careful records of

the race of each prospective juror, and a running tally of how many persons of each race

remained on the venire for possible selection."  (JA 8826.)  The court therefore found that "race

seems to have featured prominently in the thought process of the trial prosecutor."  (*Id.*)

This evidence is particularly forceful when examining the ways in which attorneys in the

DAO were taught to select juries.  *See, e.g.*, *Watson v. City of Kansas City, Kan.*, 857 F.2d 690,

696 (10th Cir. 1988) (finding the way in which officers were trained to be probative of a

custom).  The DAO's jury selection training was in part administered by: (1) the Director of

Training (Sagel); (2) "on-the-job" training from Unit Chiefs (Christie); and (3) other ADAs

(McMahon).  (JA 84, 87, 123–24.)[27]

To be sure, all of the former DAs and ADAs deposed in this case denied the existence of

a custom of discrimination in jury selection (*see generally* JA 1–156, 596–983) and the Court

makes no finding that such a custom existed; that decision is left to the jury.  The evidence in this

case, to include the McMahon Tape, Sagel's training lecture(s) and judicial criticisms of

---

[27]     This finding is buttressed by a number of Pennsylvania court decisions analyzing equal protection claims
against the DAO under the old *Swain* standard.  Although these courts ultimately found no equal protection
violation, the numbers of peremptories used to strike black jurors at the very least supports Wilson's evidence of a
custom of discrimination in jury selection.  *See, e.g.*, *Commonwealth v. Green*, 400 A.2d 182, 183 (Pa. Super. Ct.
1979) (prosecutor used 17 peremptory strikes on black jurors); *Commonwealth v. Henderson*, 438 A.2d 951 (Pa.
1981) (prosecutor peremptorily struck all black jurors on the panel); *Commonwealth v. Edney*, 464 A.2d 1386 (Pa.
Super. Ct. 1983) (prosecutor peremptorily struck all black jurors on the panel).

Christie's jury selection practices, raises genuine issues of material fact as to whether the DAO had a custom of discriminating in jury selection.[28]

### ii. Knowledge of the Policymakers

Wilson must establish that the policymakers knew of and acquiesced to a custom of racial discrimination in jury selection, or that the custom was so permanent and well settled that it could be ascribable to municipal decisionmakers.  *See Bielevicz*, 915 F.2d at 850.  The most direct evidence of knowledge and acquiescence comes from Chadwick's discussion of how he and Castille appointed personnel.  Chadwick testified that he and Castille collaborated over appointments of Deputies and Unit Chiefs who would "provide . . . excellent leadership and implement our agenda."  (JA 80.)  Sagel testified that he was appointed by Chadwick to be the director of training.  (JA 6997.)  Additionally, Christie was appointed by Castille with input from Chadwick and other Deputies.  (JA 81.)  Again, given McMahon's "instructional" video, Sagel's testimony and Christie's purported jury selection practices, a reasonable juror could ascribe to the DAO's policymakers the requisite knowledge and acquiescence to a custom of discrimination in jury selection.

### iii. Causation

Wilson must also establish causation between the custom and his constitutional injury.  Causation in this case is readily apparent given that the custom itself—discrimination in jury selection—is unconstitutional.  *See supra* Part VI.B.  A jury could find that a custom of

---

[28]     Wilson also produced an expert affidavit from Professor George G. Woodworth ("Woodworth").  (JA 425–87.)  Woodworth conducted a statistical analysis of 387 capital cases prosecuted by the DAO between 1981 and 1997 and opines that, among other things, there was a statistically significant disparity in the rate at which ADAs in the Castille administration struck black and non-black jurors.  While statistics in addition to other evidence may be probative of a municipal custom, *see e.g.*, *Beck*, 89 F.3d at 975 and *Watson*, 857 F.2d at 696, the Court does not rely in any way on the Woodworth affidavit in deciding the DAO's summary judgment motion.

discrimination in jury selection proximately caused McMahon to discriminate in selecting Wilson's jury.

### iv.  Other DAO Arguments

The DAO makes a number of arguments which are unpersuasive.  First, the DAO contends that there can be no custom where only 12 convictions have been overturned on *Batson* grounds out of the 11,893 jury trials prosecuted by the DAO between 1980 and 2000.  (DAO's Mot. at 24–25.)  This is not a failure-to-train claim, however, and Wilson need not establish a pattern of adjudicated *Batson* violations in order to establish the existence of a custom of discrimination in jury selection.

The DAO also argues that Wilson cannot establish causation because a *Batson* violation is "deemed a structural error, and a defendant receives a new trial regardless of whether the violation actually caused his conviction."  (DAO's Mot. at 10.)  The DAO accordingly contends that Wilson cannot establish that the *Batson* violation caused his underlying conviction.  (*Id.*)  The causation at issue in this case is *Monell* causation, not *Batson* causation.  A likely source of confusion for the DAO can be found in Wilson's second amended complaint, which makes clear that he is seeking damages under the *Monell* claim against the DAO for the time he spent on death row.  (Second Am. Compl. ¶¶ 42–46.)  At oral argument, however, Wilson's counsel conceded that the *Monell* claim against the DAO cannot form the basis for a damage award that takes into account Wilson's incarceration.  (Oral Arg. 116:16–18.)  The Court agrees with the DAO that a defendant cannot show that a *Batson* violation caused his conviction.  The underlying constitutional injury in this case, however, did not occur when Wilson was convicted; it occurred when McMahon discriminated in jury selection.  The question is not whether the

DAO's custom caused Wilson's conviction, but whether the DAO's custom caused McMahon to discriminate in jury selection.

The DAO also contends that "a defendant who is the victim of a *Batson* violation is entitled to a new trial, not to compensatory damages." (DAO's Mot. at 12–13.) As a general matter, the DAO is correct in asserting that "[n]umerous cases hold that a new trial is the appropriate remedy for a *Batson* violation that is discovered post-trial." (*Id*. (collecting cases).) In those cases, however, the criminal defendant was still in jail and had not already been granted a new trial and then acquitted. The same was true for Wilson when he was afforded a new trial by the PCRA Court. Once a defendant has been retried and acquitted, nothing prevents him from bringing a *Monell* claim alleging that municipal policies or customs caused the underlying *Batson* violation. This situation is identical to a scenario in which a *Brady* violation leads to a retrial, and subsequently forms the basis for a Section 1983 claim against a municipality. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51 (2011).

## VII.  *Monell* Claim Against the City

Wilson also brings a *Monell* claim against the City, alleging that the City's policies, customs or failure-to-train its officers with regard to *Brady* obligations caused Wilson to suffer a Fourteenth Amendment due process violation. (Second Am. Compl. ¶¶ 56–67.) To successfully plead his *Monell* claim, Wilson must establish an underlying constitutional violation. *See Monell*, 436 U.S. at 658.

Wilson alleges that Hoffner and Brenner committed *Brady* violations by failing to disclose certain pieces of evidence Wilson asserts are either impeaching or exculpatory.[29] (*Id*. ¶¶ 63–65.) Specifically, Wilson alleges Hoffner withheld that: (1) he threatened to take away

---

[29]     Wilson's complaint also asserts *Brady* claims against a number of other officers. (*See generally* Second Am. Compl.) In his response brief, however, Wilson concedes that he has abandoned all claims against all officers except Hoffner and Brenner. (Pl.'s Resp. to City at 2.)

Tindal's children if she did not testify against Wilson; (2) Haynes was at the Stillman House the day before the murders; (3) Haynes often wore the jacket found in Mrs. Wilson's home; and (4) he provided Mason with a benefit for testifying against Wilson.  (Pl.'s Resp. to City's Mot. Summ. J. ("Pl.'s Resp. to City") at 11–13, ECF No. 218.)  Additionally, Wilson alleges that Brenner withheld his lab notes, which included: (1) the results of the fabric impression test; and (2) the result of the first PGM test on the jacket sleeve.  (*Id.*)

### A.  *Brady v. Maryland*

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The duty to disclose such evidence applies even if there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and encompasses both impeaching and exculpatory evidence.  *See United States v. Bagley*, 473 U.S. 667, 676 (1985).  "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (citing *Bagley*, 473 U.S. at 682); *see also Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995).  *Brady*'s requirement encompasses evidence "known only to police investigators and not to the prosecutor," and must be considered "collectively, not item by item."  *Kyles*, 514 U.S. at 436–38.

While the term "'*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence . . . there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler*, 527 U.S. at 281.  Thus, the "materiality" of

the undisclosed evidence separates the mere nondisclosure of *Brady* material from a true

Fourteenth Amendment due process violation under *Brady*.  "The question is not whether the

defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy

of confidence."  *Id*. at 289–90 (citing *Kyles*, 514 U.S. at 434).  The Court must first review each

individual piece of alleged *Brady* material, and then discuss the collective effect of such

evidence on Wilson's trial.  *See Kyles*, 514 U.S. at 437 n.10.

### i.  *Brady* Material Allegedly Withheld by Hoffner

Wilson contends that Hoffner's failure to disclose that he threatened Tanya Tindal

constitutes a *Brady* violation.  (Pl.'s Resp. to City at 11–12.)  This claim fails given that Tindal

testified at Wilson's first trial that an officer—who Tindal specifically stated was not Hoffner—

threatened to take her children away.  (JA 3926–27.)  Thus, this evidence *was* disclosed, the jury

considered it in rendering its verdict, and it accordingly cannot constitute *Brady* material.[30]

Wilson also contends that Hoffner failed to disclose that he provided Mason with a

benefit for testifying at Wilson's trial.  (Pl.'s Resp. to City at 11–12.)  In support of his argument,

Wilson cites an affidavit filed by Dyson in 2013.  (JA 2119–20.)  In the affidavit, Dyson stated

that while riding the courthouse elevator with Hoffner, Mason dropped a "straight shooter of

crack cocaine" onto the elevator floor.  (*Id*.)  Hoffner allegedly "covered the vial with his foot."

(*Id*.)  Wilson contends that because Mason had an open drug case pending at the time, Hoffner's

actions can reasonably be interpreted as offering Mason a deal to testify against Wilson.  (Pl.'s

Resp. to City at 11–12.)

---

[30]     At oral argument, Wilson's counsel acknowledged that this information was disclosed, and that it
"probably does go more to the malicious prosecution claim."  (Oral Arg. 211:6–8.)

This argument fails.  The only reason Mason was at the courthouse in the first place was to testify against Wilson.  (JA 2119–20.)  Additionally, there is no evidence of any "deals" made between Hoffner and Mason.  Rather, Wilson asks the Court to speculate that Hoffner's alleged act can reasonably be interpreted as a benefit offered in exchange for favorable testimony. "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."  *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) (quoting *Hedberg v. In. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)).

Wilson also claims that Hoffner violated *Brady* by failing to disclose that: (1) Haynes was at the Stillman House the day before the murders; and (2) the jacket was one which Haynes often wore.  (Pl.'s Resp. to City at 11–12.)  Wilson points primarily to Haynes's February 2013 affidavit, wherein Haynes stated that he was interviewed by police "in front of [Wilson's] house" in 1988 and told police the jacket was "one that [he] wore very often." (JA 2117–18.)  The jacket was last seen by Haynes the "day or evening" before the murders when he left it at the Stillman House.  (*Id*.)

Like the other information allegedly withheld by Hoffner, this does not constitute *Brady* material.  First, Gillespie testified at Wilson's trial that the jacket belonged to Haynes.  (JA 3757.)  This evidence was disclosed and the jury considered it in rendering its verdict.  Similarly, Wilson's contention that Hoffner withheld the information that Haynes was at the Stillman House the day before the murders is unsupported by the record.  Haynes's affidavit merely states that he was interviewed by "police," not Hoffner.  (JA 2117–18.)  Indeed, Hoffner testified in his deposition that he never spoke to Haynes or knew who he was until Wilson's second trial.  (JA 2155.)  Hoffner cannot be said to have withheld evidence if the record fails to establish that he

knew such evidence existed.  Additionally, placing Haynes at the house the day or evening before the murders does not support Wilson's argument.  Mason told Hoffner in her original statement that five or six people came by the day before the murders to purchase cocaine from Sewell.  (JA 5948–52.)  The fact that Haynes may have been one of these six people is not exculpatory or impeaching information that should have been disclosed under *Brady*.[31]

Even if the Court assumes that Haynes's interview in front of Mrs. Wilson's house was conducted simultaneous to the search, the Court cannot reach the conclusion Wilson advances: that Haynes's affidavit, along with the fact that the inventory sheet for the search of Mrs. Wilson's home was typed, could lead a reasonable juror to conclude that the jacket was not actually recovered at Wilson's house.  (Pl.'s Resp. to City at 11–12.)  While creative, this argument is contradicted by the record.  Mrs. Wilson was at her house when the detectives recovered the jacket from her basement.  (JA 5979–84.)  Wilson contends that because Mrs. Wilson was upstairs when the jacket was found in the basement, a reasonable juror could conclude that the jacket was not *actually* found in the basement.  Again, speculation does not create a genuine issue of fact and it is "unwise to infer the existence of *Brady* material based upon speculation alone."  *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994).  The information in Haynes's affidavit does not constitute *Brady* material because it was unknown to Hoffner and is neither exculpatory nor impeaching.

---

[31]  Gillespie also submitted an affidavit on March 11, 2013, in which he stated that he told police in 1988 that Haynes was at the Stillman House the night of the murders.  (JA 2121–22.)  But according to Gillespie, "the police didn't want to hear about [Haynes]."  (*Id.*)  Gillespie also said that the police were trying to force him to lie about Wilson and say that he was violent and had a psychological breakdown.  (*Id.*)  Gillespie refused to lie and asserted that he told the police the truth.  (*Id.*)  Gillespie's affidavit, however, is contradicted by his testimony at Wilson's first trial.  Specifically, Gillespie stated that the last time he saw Haynes was Thursday before the murders—not the night of the murders.  (JA 3762.)

### ii. *Brady* Material Allegedly Withheld by Brenner

Wilson also alleges a *Brady* violation against Brenner for withholding the results of the fabric impression and PGM enzyme tests.  (Pl.'s Resp. to City at 11–12.)  Unlike the information allegedly withheld by Hoffner, these test results could constitute *Brady* material.  Had the results of the fabric impressions been disclosed, Wilson could have impeached Brenner on the fact that whatever impressions were found on the hatchet did not match the victims' clothing.  This would have enabled Wilson to argue that the hatchet may not have been the murder weapon.  Likewise, Brenner testified at Wilson's trial that the ABO, PGM and Pep-A types on the jacket matched two of the victims.  (JA 6058–65.)  He linked this specific ABO, PGM and Pep-A combination to 1.5 percent of the overall population.  (JA 4011.)  Wilson could have used the first "mixture" result to impeach the certainty of Brenner's conclusions and raise doubt as to whether the blood actually came from the victims.

### B. *Brady* Violation

Upon review of the allegedly withheld evidence, only Brenner's notes constitute *Brady* material that could give rise to a *Brady* violation.  The Court must accordingly analyze the collective effect of this evidence, in light of all the other evidence presented at Wilson's first trial, to determine whether or not its absence at Wilson's trial undermined confidence in the verdict.  *See Strickler*, 527 U.S. at 289–90 (citing *Kyles*, 514 U.S. at 434).

Although the fabric impression tests did not match any of the victims' clothing, the hatchet still contained ABO Blood Types matching any one of the three victims.  (JA 6058–65.) The hatchet was identified by Mason as the same hatchet Tyrone Mason kept in his room.  (JA 3620.)  Wilson was last seen with the victims in Tyrone Mason's room smoking cocaine.  (JA 5948–52.)  Mason locked the door to the house before she left, possibly indicating that whoever

committed the murders was already in the house.  (JA 3606.)  Additionally, the hatchet was found along the route Wilson would have taken to his mother's house.[32]  (JA 6056–57.)

The PGM test result would have most effectively been used to impeach Brenner's reported test results.  However, the fact remains that Brenner tested the jacket sleeve for a second time and obtained a conclusive result matching two of the victims.  (JA 6058–65.)  At best, the first result was inconclusive.  While "[s]uch 'negative' or 'inconclusive' results . . . may be exculpatory," Brenner's first PGM test "did not eliminate [Wilson] as the potential perpetrator." *Simmons v. Beard*, 590 F.3d 223, 236–37 (3d Cir. 2009) (citing *Gary v. Hall*, 558 F.3d 1229, 1256 (11th Cir. 2009) (holding that inconclusive bite mark exemplar was not material in rape case where rapist had bitten victim, given that other evidence did link defendant to crime)).  Although Brenner's notes reveal that the first test was inconclusive, his second test affirmatively established that the ABO, PGM and Pep-A types matched two of the victims.  (JA 6058–65.)  Had the undisclosed test results conclusively established that none of the victims' blood was on the jacket, the situation would likely be different.

The Court must consider the manifest weight of all the other evidence against Wilson.  Such evidence included: (1) Mason's testimony that Wilson claimed the jacket as his the night of the murders; (2) Wilson's statement to police that when he left the Stillman House for his mother's he was wearing a brown reversible sweater jacket; (3) a jacket matching that description was found in Mrs. Wilson's basement, where Tindal stated Wilson often slept; (4) the jacket had blood on it; (5) Tindal's testimony about Wilson's bloody pants and sneakers; (6) Tindal's testimony that Mrs. Wilson put the pants in a bag and took them away; (7) Dyson's

---

[32]  The hatchet was recovered in a sewer, surrounded by "mineral and vegetation debris" three days after the murders.  (JA 6056–60.)  Additionally, each victim suffered multiple stab and chop wounds to areas of their bodies not covered by clothing.  (JA 5930.)  The fact that any perceived impressions in the blood did not match the fabric of the victims' clothing is not surprising.

testimony that Wilson showed up to his house with an envelope full of money, despite Mason and Gillespie both stating no one (except Sewell) at the Stillman House the night of the murders had money to buy cocaine; (8) Dyson's testimony that Wilson had a fresh cut on his hand and asked for a Band-Aid and rubbing alcohol; (9) Dyson's testimony that Wilson arrived that morning unannounced with two bags; and (10) Jonathan Wilson's statement that, contrary to what Wilson told the police, Wilson never helped him move furniture. *See supra* Part I. Having considered all of this evidence, the Court finds that the nondisclosure of Brenner's lab notes does not undermine Wilson's conviction. Wilson fails to establish an underlying constitutional violation, and the Court accordingly need not address his *Monell* claim against the City in any further detail.

## VII.  Malicious Prosecution Claims Against Hoffner

Wilson claims that Hoffner maliciously initiated criminal proceedings against him without probable cause in violation of federal and state law. (Second Am. Compl. ¶ 49.) To prevail on his claim of malicious prosecution under Section 1983, Wilson must show that: (1) Hoffner initiated a criminal proceeding; (2) the criminal proceeding ended in Wilson's favor; (3) Hoffner initiated the proceeding without probable cause; (4) Hoffner acted maliciously or for a purpose other than bringing Wilson to justice; and (5) Wilson suffered a deprivation of liberty consistent with the concept of a seizure as a consequence of a legal proceeding.[33] *See McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009). Since probable cause existed at the time Wilson's criminal proceeding was initiated, his malicious prosecution claims fail. *See Montgomery v. DeSimone*, 159 F.3d 120, 124 (3d Cir. 1998) (holding that in order to prevail on a malicious prosecution claim under Section 1983, a plaintiff must establish, among other things,

---

[33]     A claim for malicious prosecution under Pennsylvania law requires proof of only the first four elements of a federal malicious prosecution claim. *See Haefner v. Burkey*, 626 A.2d 519, 521 (Pa. 1993). Since this difference has no effect on the analysis, the Court considers Wilson's state and federal malicious prosecution claims together.

the absence of probable cause for the initiation of the proceedings against her).  Because Hoffner

had probable cause to believe Wilson committed the murders, it is unnecessary to evaluate the

other disputed elements of Wilson's claim—specifically, that Hoffner maliciously initiated the

criminal proceedings against Wilson.

Probable cause exists when "reasonably trustworthy information or circumstances within

a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude

than an offense has been committed by the person being arrested."  *United States v. Myers*, 308

F.3d 251, 255 (3d Cir. 2002).  It requires more than a "mere suspicion," but does not require

evidence sufficient to prove guilt beyond a reasonable doubt.  *United States v. Glasser*, 750 F.2d

1197, 1205 (3d Cir. 1984).  "A court determining whether an officer had probable cause

considers an objective officer's beliefs rather than the arresting officer's state of mind."

*Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  "Usually, the existence of probable cause is a

question of law for the court rather than a jury question, but may be submitted to the jury when

facts material to the issue of probable cause are in controversy."  *Hayfield v. Home Depot U.S.A.,

Inc.*, 168 F. Supp. 2d 436, 465 (E.D. Pa. 2001) (internal citation and quotation marks omitted).

Wilson contends that Hoffner "initiat[ed] charges against him despite lacking probable

cause to do so."  (Pl.'s Resp. to City at 5.)  Specifically, he claims that the presence of scrapes on

Wilson's hands, the tan jacket recovered from Mrs. Wilson's house, the hatchet that police found

"somewhere in Philadelphia" and the money that Wilson "may have found" sometime after the

murders did not "provide probable cause to arrest Mr. Wilson for the triple murder and initiate

charges against him."  (Pl.'s Resp. to City at 7.)  That characterization of the evidence, however,

significantly understates the facts known to Hoffner at the time Wilson was "slated" for prosecution at 10:55 p.m. on April 11.[34]  (JA 6089.)

Between Mason's discovery of the bodies on the morning of April 10 and the evening of April 11, Hoffner and other detectives interviewed Mason, Gillespie, Craig, Wilson, Mrs. Wilson, Tindal, Dyson and Moore.  *See supra* Part I.  The police also searched and retrieved evidence from the Stillman House and Mrs. Wilson's home.  *Id.*  In her interview with Hoffner, Mason stated that Sewell kept "a lot of money in her pocketbook" and that Wilson was the only individual remaining in the Stillman House when she left at 4:00 o'clock that morning aside from the three victims and her 98 year-old grandfather.  (JA 5948–52.)  Mason also told Hoffner that over the course of the weekend, Wilson was staying at the Stillman House smoking cocaine in Tyrone Mason's bedroom and was "wearing a tan waist length windbreaker type jacket."  (*Id.*)  According to Mason, Tyrone Mason kept "all kinds of knives and stuff" in his room.  (*Id.*)

In subsequent interviews with Gillespie and Dyson, Hoffner learned that Wilson did not have any money to buy cocaine while at the Stillman House, though he did have money to buy $70 worth of cocaine on April 10 at Dyson's house after the murders.  (JA 5955–57, 5987–92.)  When Wilson came to the police station for questioning on the morning of April 11, Gibson observed a scrape on Wilson's palm, an injury to the webbing of Wilson's hand and a scrape to his knuckle.  (JA 2716.)  In interviews that same day, Dyson and Moore told detectives that they saw a scrape on Wilson's hand when he came to their house on the morning of April 10.  (JA 5976–78, JA 5987–92.)  Dyson stated that it "looked like [Wilson] had been in a fight" and that Wilson asked Dyson for a Band-Aid.  (JA 5987–92.)  Dyson also told Hoffner that when Wilson

---

[34]     The Court considers the "slated" time as the time that charges were initiated against Wilson.  According to Hoffner, that is the time that Wilson is "officially put [ ] in the arrest book at the district of occurrence."  (JA 6089–90.)  Wilson specifically contends that proceedings were initiated when Hoffner "officially put him in the arrest book at the district of occurrence."  (Pl.'s Resp. to City at 5.)

arrived at his house on April 10, Wilson "had an envelope with a [l]ot of bills in it."  (*Id.*)  This mirrored Mason's statement where she told Hoffner Sewell kept "a lot of money in her pocketbook," sometimes amounting to thousands of dollars.  (JA 5948–52.)

On April 11, police interviewed Tindal and Mrs. Wilson.  *See supra* Part I.  Tindal told Hoffner that she noticed a scratch on Wilson's chest when she saw him smoking cocaine naked in her kitchen during the early morning hours of April 11.  (JA 5969–73.)  She told Hoffner that she noticed blood on Wilson's white sneakers and brown pants.  (*Id.*)  Wilson told Hoffner during his interview that he was wearing white sneakers, brown pants and a brown reversible jacket at the Stillman House on the night of the murders.  (JA 7152–55.)  Pursuant to their search of Mrs. Wilson's house on April 11, police recovered a brown waist-length reversible jacket with what appeared to be blood stains.  (JA 6068–69.)  They did not, however, recover Wilson's blood-stained pants which, according to Tindal, Mrs. Wilson took with her.  (JA 5969–73.)  They have not been seen since.

Based on a common sense approach and viewing the totality of the circumstances, by the evening of April 11 Hoffner had probable cause to believe that Wilson committed the murders at the Stillman House.  *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) ("A 'common sense' approach must be taken to the issue of probable cause and a determination as to its existence must be based on 'the totality of the circumstances.'") (citing *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (internal quotation marks omitted)).  Hoffner was entitled to rely on statements provided by witnesses, including Mason, Gillespie, Tindal and Dyson, and was under no duty to continue a search for other suspects once probable cause had been established.  *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790–91 n.8 (3d Cir. 2000) (citing *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028 (1987)).  Based

48

on the interviews on April 10 and 11, Hoffner reasonably believed that Wilson was the last individual seen with the three victims, had scrapes on his hands and chest the day after the murders, had blood on the shoes, pants and jacket he was wearing that night, and had money at Dyson's house on the morning of Sunday April 10 despite not having money at the Stillman House the previous evening.  Under these facts, probable cause to believe Wilson committed the murders existed and his malicious prosecution claims must fail.[35]

## VIII.  IIED Claims Against Hoffner and Brenner

Wilson also asserts claims for intentional infliction of emotional distress ("IIED") against both Brenner and Hoffner.  (Second Am. Compl. ¶ 51.)  To establish a claim for IIED, Wilson must establish conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (citing *Buczek v. First Ntl. Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).  "Conduct that Pennsylvania courts have deemed sufficiently outrageous to constitute IIED includes: (1) killing the plaintiff's son with an automobile and then burying the body, rather than reporting the incident to the police; (2) intentionally fabricating documents that led to the plaintiff's arrest for murder; and (3) knowingly releasing to the press false medical records diagnosing the plaintiff with a fatal disease."  *Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp. 2d 739, 756 (M.D. Pa. 2009) (citing *Hoy*, 720 A.2d at 754 (collecting cases)).

Neither Brenner nor Hoffner's conduct "go beyond all bounds of decency" such that they are "utterly intolerable in a civilized society."  *Hoy*, 720 A.2d at 754.  Brenner's withholding of notes was consistent with department policy.  (JA 2511–12.)  At most it was an error in reporting

---

[35]     Because the Court dismisses Wilson's Fourth Amendment malicious prosecution claim against Hoffner, it need not address Hoffner's qualified immunity defense.  (City's Mot. Summ. J. ("City's Mot.") at 10–13, ECF No. 213.)

that, as discussed above, did not affect the confidence in the jury's verdict at Wilson's trial.  As to Hoffner, Wilson contends that *Walker v. N. Wales Borough*, 395 F. Supp. 2d 219, 232 (E.D. Pa. 2005) is instructive.  In *Walker*, the Court held that the plaintiff's complaint sufficiently alleged a claim for IIED where the plaintiff was "handcuffed, taken into custody for a 'significant period of time,' accused of being drunk, and forced to take two Breathalyzer examinations, *all without probable cause*."  *Walker*, 395 F. Supp. 2d at 232 (emphasis added).  In this case, Hoffner had probable cause to charge Wilson with the murders and therefore did not commit acts utterly intolerable in a civilized society.  *See Dull*, 604 F. Supp. 2d at 756 (finding improper arrests not sufficiently extreme or outrageous to prevail on an IIED claim).[36]  Wilson therefore fails to establish an IIED claim.

The Court grants the City's motion and denies the DAO's motion to the extent it seeks judgment on Wilson's *Monell* claim based on a custom of racial discrimination in jury selection.  An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[36]     Because the Court dismisses Wilson's IIED and state law malicious prosecution claims, it need not address Hoffner and Brenner's Tort Claims Act defense.  (City's Mot. at 23–24.)